In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00006-CR


______________________________




JOHNATHAN TOLIVER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 241st Judicial District Court


Smith County, Texas


Trial Court No. 21-0130-07




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 As he sat in his Smith County jail cell, Johnathan Toliver's outlook for the future was
decidedly bleak. He had been arrested for three incidents of delivery of cocaine; two of these
charges were first-degree felonies and one was a second-degree felony. The cases appeared quite
strong because law enforcement officers had used Jimmy Wallace as a confidential informant and
had made video recordings of each of these incidents, during which Toliver had sold Wallace
cocaine. Toliver's predicament in regard to the pending charges was exacerbated by the fact that he
had previously been convicted of a felony assault; when these new charges arose, the State could use
Toliver's prior conviction for enhancement purposes. Considering the strength of the cases, the
multiple charges pending against him, and the previous felony conviction, Toliver was faced with
the potential of receiving as much as two life sentences, plus a twenty-year sentence. 

 The State maintained that Toliver concocted a plan to ameliorate the problem. The plan
involved a plot by Toliver and others to have Wallace killed, silencing him forever. After the
scheme was discovered, Toliver was charged with a conspiracy to murder Wallace, tried before a
Smith County jury, (1) convicted, and sentenced to life imprisonment, plus a fine of $10,000.00. It is
from that conviction that Toliver now appeals. 

 Toliver's appeal claims the trial court erred in allowing detailed evidence about the drug
transactions; in denying a continuance during trial; and in denying Toliver his right to confront a
co-conspirator or accomplice witness. We affirm the trial court's judgment. 

1. Extraneous-Offense Evidence

 Toliver first complains of the trial court 's admission of extraneous-offense evidence. The
evidence of which Toliver complains regarded three sales of crack cocaine during which Wallace
acted as a confidential informant. 

 A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion
standard. McDonald v. State, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); Willover v. State, 70
S.W.3d 841, 845 (Tex. Crim. App. 2002). A trial court does not abuse its discretion so long as the
decision to admit evidence is within the "zone of reasonable disagreement." Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). An appeals court may not substitute
its own decision for that of the trial court. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App.
2003). If the record supports the trial court's decision on the admission of evidence, there is no abuse
of discretion, and the decision of the trial court will not be reversed. Osbourn v. State, 92 S.W.3d
531, 537 (Tex. Crim. App. 2002); Montgomery, 810 S.W.2d at 379.

 Although the general rule is that evidence of extraneous crimes is not admissible, that
evidence can be admitted if it satisfies the requirements of the following two-pronged test: (1) the
offense is relevant to a material issue in the case, other than the issue of the defendant's character;
and (2) the probative value of the evidence is not substantially outweighed by the danger of unfair
prejudice. Prieto v. State, 879 S.W.2d 295, 297 (Tex. App.--Houston [14th Dist.] 1994, pet. ref'd). 
The material issues in each case are determined by the respective theories proffered by the State and
the defense. See Bush v. State, 958 S.W.2d 503, 505 (Tex. App.--Fort Worth 1997, no pet.). For
example, evidence of extraneous crimes may be admissible to show motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident. Tex. R. Evid. 404(b). If
an objection is made to the admission of extraneous-offense evidence, the proponent of the evidence
must then meet the burden of persuading the trial court that the evidence has relevance apart from
character conformity, that it tends to establish some elemental fact (such as identity or intent), that
it tends to establish some evidentiary fact (such as motive, opportunity, or preparation leading
inferentially to an elemental fact), or that it rebuts a defensive theory by showing the absence of
mistake or accident. Id. 

 A) Admission of Evidence of Toliver's Extraneous Offenses

 In May and June 2006, Toliver sold crack cocaine to Wallace, who was working as a
confidential informant for the Tyler Police Department. (Toliver does not contest the allegations of
delivery of controlled substance.) These deliveries formed the bases for three indictments, in which
Toliver was charged with delivery of a controlled substance, less than one gram; delivery of a
controlled substance, four or more grams but less than 200 grams; and delivery of a controlled
substance, one or more grams but less than four grams. The first indictment alleged that the offense
had been committed within 1,000 feet of a playground and that Toliver had a prior felony conviction
for aggravated assault. The second indictment also alleged as an enhancement the prior felony
conviction for aggravated assault. Thus, the indictments presented one second-degree felony and
two first-degree felonies. See Tex. Health & Safety Code Ann. § 481.112 (Vernon 2003),
§ 481.134 (Vernon Supp. 2008); Tex. Penal Code Ann. § 12.42(b) (Vernon Supp. 2008). The
State offered video recordings of the three drug sales, the actual crack cocaine which had been sold
and purchased, testimony from a Texas Department of Public Safety chemist establishing that the
substance the subject of these sales was actually cocaine, and testimony from confidential informant
Wallace regarding the transactions. Toliver argues that the indictments were sufficient evidence for
the State's evidentiary burden and that the additional evidence was neither required nor warranted. 

 The State claimed to the trial court that evidence of Toliver's sale of crack cocaine was
admissible as evidence of his motive to conspire to have Wallace killed. The State pointed out that
Toliver was under indictment for two first-degree felonies and a second-degree felony; he, therefore,
faced the possibility of two life sentences and a sentence of up to twenty years. The State also
introduced a judgment revoking the community supervision on Toliver's previous conviction for
aggravated assault (which precluded a grant of community supervision from any range of punishment
should Toliver be convicted of one or more of the drug delivery charges). The State argued that the
seriousness of possible penalties in those cases furnished Toliver's motive for the conspiracy. 

 As stated above, motive is one of the possible bases for admission of extraneous-offense
evidence. See also Williams v. State, 974 S.W.2d 324, 331 (Tex. App.--San Antonio 1998, pet.
ref'd) (evidence of Williams's gang affiliation admissible to prove motive, where motive for robbery
was to acquire guns to arm gang). The Texas Court of Criminal Appeals has addressed a similar
situation in Russell v. State, (2) wherein the appellant was convicted of capital murder. The State
alleged that Russell killed a confidential informant with whom Russell was in a relationship. The
State's theory was that Russell killed the victim in retaliation for her having introduced Russell to
an undercover police officer to whom Russell then sold crack cocaine. Id. at 177-78. Russell pled
guilty to delivery of a controlled substance; the trial court granted Russell's request to delay
execution of the ten-year sentence received by him in that case. Shortly thereafter, the
victim/informant was slain. At Russell's capital murder trial, the State admitted into evidence several
photographs related to the arrest and conviction for delivery of a controlled substance and questioned
Russell about them. Russell admitted that the drugs in one of the pictures were the drugs he had sold
to the undercover officer. In rejecting Russell's appellate complaint that the trial court erred in
admitting cross-examination on this evidence, the Texas Court of Criminal Appeals said: 

 These questions, and the photographs on which they were based, were about the
offense of cocaine delivery to Bush for which the appellant had been indicted and
convicted before the murder--the offense that began when Brewer cooperated with
Officer Bush by introducing him to the appellant. The indictment alleged that it was
in retaliation for that act of cooperation that the appellant killed Brewer. This was
not an irrelevant, extraneous offense that showed only that the appellant was a
criminal generally. There was no error in the admission of the two photographs or
the cross-examination during which they were admitted. 

Russell, 155 S.W.3d at 183. We find that the decision of the trial court to admit the
extraneous-offense evidence regarding Toliver's drug sales lay within the zone of reasonable
disagreement (see Montgomery, 810 S.W.2d at 391) and, accordingly, the trial court did not abuse
its discretion in admitting same. (3) 

 B) Texas Evidence Rule 403 Balancing Test

 After finding the trial court did not abuse its discretion in admitting the extraneous evidence,
we next review the trial court's balancing of the prejudicial nature of this evidence against its
probative value. See Tex. R. Evid. 403; Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App.
1999). In evaluating the trial court's determination under Rule 403, a reviewing court is to reverse
the trial court's judgment "rarely and only after a clear abuse of discretion," recognizing that the trial
court is in a superior position to gauge the impact of the relevant evidence. Mozon, 991 S.W.2d at
847 (quoting Montgomery, 810 S.W.2d at 389).

 The relevant criteria in determining whether the prejudice of an extraneous offense
substantially outweighs its probative value include: 

 (1) how compellingly the extraneous offense evidence serves to make a fact of
consequence more or less probable--a factor which is related to the strength of the
evidence presented by the proponent to show the defendant in fact committed the
extraneous offense; 

 

 (2) the potential the other offense evidence has to impress the jury "in some irrational
but nevertheless indelible way"; 


 (3) the time the proponent will need to develop the evidence, during which the jury
will be distracted from consideration of the indicted offense; [and] 


 (4) the force of the proponent's need for this evidence to prove a fact of consequence,
that is, does the proponent have other probative evidence available to him to help
establish this fact, and is this fact related to an issue in dispute.

 

Id. (citing Montgomery, 810 S.W.2d at 389-90). 

Factor 1: Did Extraneous-Offense Evidence Make a Fact of Consequence More or Less
Probable?


 The State offered evidence of Toliver's drug sales and of his prior conviction of aggravated
assault to prove his motive for conspiring to kill Wallace. The fact that Toliver faced indictments
with the possibility of two life sentences and another sentence of up to twenty years, and was
ineligible for community supervision, provided Toliver with a strong motive to kill Wallace. 
Wallace was a significant, if not indispensable, witness for the State in its prosecution of those
charges; the promise of his unavailability as a witness would give Toliver strong impetus to do away
with Wallace. 

 We find the evidence of Toliver's sales of cocaine was relevant to the issue of Toliver's
motive to conspire to kill Wallace. There was substantial evidence of Toliver's guilt in the delivery
of controlled substance cases, which would have subjected Toliver to some of the highest penalty
ranges available under Texas law; Wallace's potential testimony would have been an integral part
of any successful prosecution of those cases. This factor weighs in favor of the admission of the
extraneous-offense evidence.

Factor 2: Potential to Impress Jury "In Some Irrational but Nevertheless Indelible Way"

 Obviously, it is a core principle of our criminal justice system that a defendant has a right to
be tried only for the charged offense and not for his or her general predisposition as a criminal. See
generally Tex. R. Evid. 404(b) (prohibiting use of extraneous offenses to prove character and
subsequent conduct in conformity with that character); Ford v. State, 484 S.W.2d 727, 729 (Tex.
Crim. App. 1972) (holding extraneous-offense evidence must be relevant on some theory other than
general proposition that one who commits one crime is prone to commit another). Here, evidence
of Toliver's serial drug dealing had a significant potential to inflame the jury's perception of Toliver
as a criminal in general. During the trial from which this appeal has been taken, the State established
Toliver's history as a criminal in general: at least three pending cases of trafficking in cocaine and
one adjudicated instance of aggravated assault. Taken in conjunction with the charged crime of
conspiracy to commit capital murder and the fact that several of the State's witnesses were prison
or jail inmates relating statements made to them by Toliver while incarcerated with him, there was
a substantial amount of evidence before the jury which could very well have affected its view of
Toliver in an irrational or indelible manner.

 In Montgomery, the keystone case for Rule 404(b) and 403 analysis, during Montgomery's
trial on charges of indecency with a child, the State introduced evidence that Montgomery walked
nude around the house with an erection. Finding the extraneous-offense evidence of walking around
with an erection to be more prejudicial than probative, the court explained that

 [t]hough relevant, such evidence has only marginal probative value. By contrast, the
danger of unfair prejudice from such testimony is substantial. Both sexually related
misconduct and misconduct involving children are inherently inflammatory. Many
in our society would condemn appellant for his conduct whether they believed it
showed sexual arousal directed at his children, an undifferentiated sexual arousal
imprudently displayed, or simply an incidental erection coupled with a damnable
nonchalance. In any event there was a grave potential for decision on an improper
basis, as jurors may have lost sight of specific issues they were called upon to decide
and convicted appellant out of a revulsion against his parental demeanor.


Montgomery, 810 S.W.2d at 397. (4) 

 More recently, the Texas Court of Criminal Appeals re-examined this factor in light of the
United States Supreme Court's post-Montgomery opinion in Old Chief v. United States, 519 U.S. 172
(1997), and incorporated a quote from Old Chief in its opinion: "the term 'unfair prejudice,' as to a
criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the
factfinder into declaring guilt on a ground different from proof specific to the offense charged." 
Manning v. State, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003) (footnote omitted). (5) Ultimately, in
Manning, the Texas Court of Criminal Appeals determined that this factor did not weigh against
admission of the evidence that Manning had a cocaine metabolite in his blood after the accident
which formed the genesis of the manslaughter charge against him. Because the indictment had
alleged that Manning's recklessness was caused by the consumption of a controlled substance,
evidence that he had consumed cocaine was pertinent to an allegation in the charging instrument. 
Id. at 927. Therefore, reasoned the high court, the evidence "was not unfairly prejudicial." Id. at
928. "It did not have a great potential to impress the jury in an 'irrational' way. Although there was
some risk that the jury would convict Manning solely because it believed he was a cocaine user, that
risk did not substantially outweigh the probative value of the evidence." Id. 

 We find Toliver's situation distinguishable from that in Manning. Although the consumption
of a controlled substance was pertinent to an allegation in the charging instrument in Manning,
motive is not an element in the charging instrument in Toliver's indictment for conspiracy to commit
murder. While motive is not an element which must be proven in Toliver's case, (6) it is, nonetheless,
an appropriate and permissible area of evidence. Still, the Texas Court of Criminal Appeals's
analysis of this factor in Manning relied heavily on the relation of the evidence (cocaine metabolites
found in Manning's system) to part of his charged offense. (7) Here, such a relation is not present. 
There was a substantial amount of evidence presented about Toliver's drug dealing, and a significant
amount of trial was spent presenting this evidence. We find evidence of Toliver's history of drug
dealing had at least the potential to unfairly prejudice the jury. Therefore, this factor weighs against
admission of the evidence. 

Factor 3: Amount of Time State Spent Developing Extraneous Evidence

 The State's case-in-chief at the guilt/innocence phase of Toliver's trial took three days; on the
fourth day, Toliver presented evidence and closing arguments were presented. In about 408 pages
of record testimony, (8) approximately 92 pages of testimony centered on the extraneous offenses. (9) 
Thus, about 23% of the State's case centered on the extraneous offenses. Additionally, the State
played three videos of the drug transactions. These aggregate to approximately sixty-seven
minutes. (10) 

 As discussed above, this Court's decision in Manning was reversed by the Texas Court of
Criminal Appeals. In examining this factor in Manning, we found that about one-fifth of the trial
was spent proving the presence of cocaine metabolites in Manning's system. Manning, 84 S.W.3d
at 23. Here, we find that just over that amount, 23%, of the trial testimony was spent on the
extraneous-offense evidence. We add to that the length of the video exhibits. The Fort Worth Court
of Appeals found that where almost 30% of trial was spent on one extraneous offense, such time
weighed against the evidence's admission. Russell, 113 S.W.3d at 546. (11) While bearing in mind the
complexity and difficulty of proving conspiracy, we nonetheless find that the amount of time used
to prove the extraneous offenses here weighs against their admission.

Factor 4: Proponent's Need for Evidence of Extraneous Offense 

 The State's burden was to prove beyond a reasonable doubt that Toliver was guilty of
conspiring to kill Wallace. Direct evidence is rarely available to prove a conspiracy hatched in
secret; circumstantial evidence, including the conspiratorial conduct, must be relied on to prove the
essential elements of the crime. Farrington, 489 S.W.2d 607; Caddell v. State, 865 S.W.2d 489, 492
(Tex. App.--Tyler 1993, no pet.). The State did have witnesses who testified to statements made
by Toliver to the effect he wanted Wallace dead. For example, Richard Keith Lawson testified that,
for a time, he shared a cell with Toliver. Lawson further testified that Toliver had asked him how
he would kill a man if he were paid to do so and that Toliver wanted Wallace dead so Wallace could
not testify against Toliver. Another inmate who had been incarcerated with Toliver, Ronnie Caddell,
testified Toliver said to him that Toliver was going to "take care" of Wallace and that Caddell
thought Toliver was serious about killing Wallace. Caddell said that he had seen Toliver talking
with Lawson in the jail. In addition, several witnesses testified that Toliver possessed a cellular
telephone while in the jail and he had been seen and heard using it. Jonathan Brown testified that
Toliver used a cellular telephone while in jail to call Brown; when he did so, Toliver said he knew
that Wallace was a witness against Toliver and that Toliver wanted to kill Wallace. A jailer, indicted
as a co-defendant, admitted that she had printed a picture of Wallace from the jail's book-in system
and had given it to Toliver. There was also evidence adduced from Brown regarding efforts taken
by Toliver and his mother to bond out of jail another co-defendant, and then bond out Wallace
himself. When Brown was arrested, he and another co-defendant were in Toliver's mother's car. 
Brown testified that Toliver's mother gave him permission to use the car that day and about three
weeks prior, she had posted bond for another of the co-conspirators. 

 Another factor to consider was the issue of just how vital Wallace's testimony was to the
prosecution of the drug cases. Wallace, Toliver, and the State were all aware of the integral and
critical role which Wallace's testimony would play in such a prosecution. The sole way that the jury
in the conspiracy to murder case could grasp the necessary part which Toliver knew Wallace would
have played in the prosecution of the drug cases would have been to lay the State's cards in those
cases face up. In so doing, the jurors could then appreciate the need which Toliver felt to remove
this necessary link in the State's case against him. Toliver takes the position that a simple
introduction of copies of the indictment against him would have sufficed to show the motive here;
that would not take into account the importance of Wallace to that prosecution and, hence, Toliver's
belief that his freedom might hinge on silencing Wallace.

 As stated earlier, because of its generally secretive nature, conspiracy is often a difficult
crime to prove and that while it is not necessary to prove the motive giving rise to a crime, it is a
permissible area of evidence. Looking at the record as a whole, we find the State's need for this
extraneous evidence was real, though not absolutely vital. There appears to be a slight weight in
favor of admission of the evidence.

 However, it is the questionable need of the State for the evidence in dispute that leads us to
conclude the trial court did not abuse its discretion in admitting it. While we have concluded the
State had other competent evidence tending to prove the conspiracy, we cannot say that the State did
not have some need for this evidence, especially considering the degree that the harsh penalties to
which Toliver was susceptible for the delivery charges would serve as motive for the conspiracy and
the integral part which the proposed victim of the murder plot would have played as a witness in
Toliver's pending trials. That said, we are not in a position to determine which parts of the evidence
should have been excluded. While it may have been prudent, for example, to admit testimony of the
delivery cases but not the video exhibits, or the actual cocaine itself, or the chemist's testimony that
the substance sold was, indeed, cocaine, it is precisely those kinds of decisions which were plainly
in the trial court's discretion. On several occasions, in answer to Toliver's objections, the trial court
explicitly stated that it had performed the balancing test required by Rule 403 and had found the
evidence admissible. As the Texas Court of Criminal Appeals stated, citing the United States
Supreme Court, in Manning, it is the danger of unfair prejudice which controls the balancing test. (12) 

 Here, reviewing the record as a whole and giving due deference to the trial court, we cannot
say it abused its discretion in finding the danger of unfair prejudice did not substantially outweigh
the probative nature of the State's proffered extraneous-offense evidence. 

 We overrule Toliver's first point of error. 

2. No Error Where Trial Court Denied Request for Continuance

 Toliver's second point of error complains that the trial court erred in not granting a
continuance during trial. We find this point was not preserved for our review and overrule it.

 One of the State's witnesses was Brown, a co-defendant and indicted co-conspirator. Brown
testified that he had worked for Toliver, selling drugs. Brown admitted his participation in the
conspiracy. Brown said that while Toliver was incarcerated, Toliver had called him on a cellular
telephone. During that conversation, Toliver told Brown that he knew that Wallace was the
confidential informant on Toliver's delivery cases and that the only way Toliver could avoid
conviction on those cases was to have Wallace "murked off" (murdered). Toliver also related to
Brown that he, Toliver, had arranged for a person to kill Wallace. On the day Wallace was released
from jail on bond, Brown and another co-conspirator, Jesse James Jackson (who had previously been
bonded out by Toliver's mother), were driving in Toliver's mother's white Cadillac. Brown testified
he was the only person Toliver trusted to drive his mother's car. Wallace saw the white Cadillac
driving around the jail after he was released from jail and recognized Brown and Jackson in the
vehicle. Wallace also testified he recognized the car as the one usually driven by Toliver's mother. 
Part of the plan involved Brown and Jackson picking up Wallace and taking him to Jackson's house,
where they were to keep Wallace there until another person, the killer, would come and take Wallace
to be killed. 

 Brown testified that although he would like to be given a probated sentence, he fully
understood there was no agreement in place wherein he would benefit from his testifying against
Toliver. The trial court held an extensive hearing out of the presence of the jury during which Tonda
Curry, an attorney representing Brown on his conspiracy charge, testified via teleconference because
she was out of the state at the time. Curry testified that she and Brown had met with prosecutors,
but the only agreement reached concerning any sentence was that when Brown pled guilty to the
charge against him, the sentencing judge would be made aware of Brown's cooperation with the State
on Toliver's prosecution. It was agreed by both parties and the trial court that the trial judge hearing
Toliver's trial would also be presiding over any future plea by Brown. 

 On appeal, Toliver complains the trial court should have granted Toliver a continuance to
secure Curry's presence at trial. We first point out that Curry explicitly testified that there was no
quid pro quo agreement between her client and the State in exchange for Brown's testimony. Curry
stated that she believed Brown had "an unreasonable expectation" that he might receive a probated
sentence because of his cooperation in Toliver's prosecution, although she had told him that it was
"legally possible" to grant probation. However, she was unequivocal that the only agreement, to the
extent one existed, was that the judge who would ultimately preside over Brown's case would be
made aware of his cooperation in the Toliver prosecution. 

 Toliver never asked the trial court to grant a continuance for him to get Curry to testify before
the jury. After the lengthy teleconference hearing and arguments, Toliver's attorney told the trial
court he had not subpoenaed Curry because he did not think he needed to; his counsel said that he
did not know until Brown testified that there was the possibility of an agreement for Brown to
receive a lesser punishment in exchange for his testimony. (13) However, at no point did he formally
request, or by our reading of the record make clear to the trial court, his desire for a continuance. (14) 
After presenting one defensive witness, counsel "re-urge[d]" his request for a continuance to secure
Curry's testimony. 

 Nowhere in the record do we find that Toliver filed a written, sworn request for a
continuance. See Tex. Code Crim. Proc. Ann. arts. 29.03, 29.08 (Vernon 2006). Where a
defendant's motion for continuance is neither in writing nor sworn to, nothing is preserved for
review. Dewberry v. State, 4 S.W.3d 735, 755 (Tex. Crim. App. 1999); Matamoros v. State, 901
S.W.2d 470, 478 (Tex. Crim. App. 1995); Johnson v. State, 257 S.W.3d 778, 781 (Tex.
App.--Texarkana 2008, pet. ref'd) (motion in writing but not sworn, not preserved).

 We find that Toliver failed to preserve this matter for appellate review, and accordingly
overrule his second point of error. 

3. Right to Confrontation

 In his final point of error, Toliver complains that he was deprived his right of confrontation
of a witness when the State introduced evidence of statements made by Toliver's mother, an indicted
co-conspirator, to a Tyler police officer. This point is not preserved for appellate review and we
overrule it.

 On October 8, 2006, after Wallace had been discharged from jail on bond, Tyler police began
investigating the suspicious nature of the issuance of the bond. They encountered the white Cadillac
reported by Wallace in front of the house of Jackson. When they made contact with Brown, the
driver of the Cadillac, he told them that the car belonged to Aldene Dunning, "a lady friend of his,"
and that Brown was using it with her permission. Brown produced a cellular telephone, called
Dunning, and gave the telephone to the officers so they could speak to her and verify that Brown had
permission to use the car. Over the telephone, Dunning identified herself and confirmed both that
she knew Brown and that she had loaned him the Cadillac. By this juncture in time, the police knew
that Dunning had previously arranged for Jackson to be released from jail on bond; on the cellular
telephone, the officer asked her about Jackson's whereabouts, but Dunning denied knowing him. 
When they confronted her with the bonding information, although she admitted bonding out Jackson,
she persisted that she neither knew how to locate him nor how to contact him. Brown told officers
the cellular telephone actually belonged to Dunning, and she then gave officers permission to look
through the contacts stored on the telephone. Stored in the memory of the cellular telephone was
evidence that Dunning had placed calls to and received calls from the cellular telephone found earlier
that day in Toliver's possession inside the jail. Toliver claims on appeal that Dunning's statements
to the police over the cellular telephone were testimonial, as contemplated in Crawford v.
Washington, (15)
 and, therefore, Toliver was deprived of his constitutional right to confront witness
Dunning, his mother.

 Earlier in trial, though, Brown had testified to substantially the same things presented in the
officer's recitation of his conversation with Dunning. Brown testified, without any objection by
Toliver, that he was driving a car owned by Toliver's mother, who was Dunning; that Dunning had
bonded out Jackson with the intent that Wallace would stay with Jackson until Wallace was killed. 

 We need not decide whether there was any error in the trial court's admission of statements
attributed to Dunning. To preserve error on appeal, the complaining party must make a timely,
specific objection and obtain a ruling on the objection. Tex. R. App. P. 33.1(a); Wilson v. State, 71
S.W.3d 346, 349 (Tex. Crim. App. 2002). Further, a party must continue to object each time
inadmissible evidence is offered. Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). 
Because Toliver did not object when the same evidence was admitted via Brown's testimony, this
complaint is not preserved for appeal. We overrule Toliver's third point of error.

 We affirm the trial court's judgment. 




 Bailey C. Moseley

 Justice


Date Submitted: December 16, 2008

Date Decided: January 21, 2009


Publish

1. This case was transferred to this Court by the Texas Supreme Court pursuant to its docket
equalization efforts. See Tex. Gov't Code Ann. § 73.001 (Vernon 2005). We are unaware of any
conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant
issue. See Tex. R. App. P. 41.3.
2. 155 S.W.3d 176 (Tex. Crim. App. 2005).
3. Also, any extraneous-offense evidence may not be considered by the jury unless there is
sufficient evidence to support a finding the defendant committed the extraneous offense beyond a
reasonable doubt. Tex. R. Evid. 104(b); Harrell v. State, 884 S.W.2d 154, 160 (Tex. Crim. App.
1994) ("[I]n deciding whether to admit extraneous offense evidence . . . the trial court must, under
rule 104(b), make an initial determination at the proffer of the evidence, that a jury could reasonably
find beyond a reasonable doubt that the defendant committed the extraneous offense.").
4. Compare Russell v. State, 113 S.W.3d 530, 544-45 (Tex. App.--Fort Worth 2003, pet. ref'd)
(evidence of gruesome robbery and murder, along with graphic depictions of sexual assaults during
offense, which were "more heinous" than offense for which Russell was being tried, "very likely
impressed the jury in some indelible way" to convict appellant for extraneous offense); Taylor v.
State, 93 S.W.3d 487, 504 & 506-07 (Tex. App.--Texarkana 2002, pet. ref'd) (holding trial court
abused discretion under Rule 403 by admitting despicable story written by defendant about "sex
enjoyed by men and women with both willing and unwilling young girls" in prosecution for
possession of child pornography).
5. Manning reversed this Court's decision, at 84 S.W.3d 15 (Tex. App.--Texarkana 2002),
where we found harmful error in the trial court's admission of the cocaine metabolite evidence. On
remand, we affirmed the trial court's judgment. Manning v. State, 126 S.W.3d 552 (Tex.
App.--Texarkana 2003, no pet.).
6. See Farrington v. State, 489 S.W.2d 607, 610 (Tex. Crim. App. 1972).
7. Manning, 114 S.W.3d at 928 ("Although there was some risk that the jury would convict
Manning solely because it believed he was a cocaine user, that risk did not substantially outweigh
the probative value of the evidence when the evidence specifically pertained to an allegation in the
indictment.").
8. We have only counted direct and re-direct examination by the State, and tried to exclude
lengthy bench conferences and arguments from our count.
9. This includes about six pages of testimony comparing Toliver's fingerprints with those on
his judgment for aggravated assault. 
10. However, some twenty-three minutes of the longest recording shows nothing more than
Wallace sitting alone in a motel room. Further, it is not possible to determine from the record how
much of each of these recordings was actually displayed to the jury. 
11. In Russell, about 19% of trial was spent addressing a second extraneous offense, the
admissibility of which was not challenged. 
12. Manning, 114 S.W.3d at 928 (citing Old Chief, 519 U.S. at 180).
13. Having reviewed Brown's testimony and the teleconference hearing, we find no indication
of any agreement. It is true Brown expected to receive some benefit from his testimony against
Toliver. But the record makes clear the only benefit promised by the State, and expected by Brown's
counsel, was that the sentencing judge, who would be the same in Toliver's and Brown's cases,
would be made aware that Brown cooperated with the State on Toliver's case. There was no
agreement for Brown to receive any particular sentence.
14. Toliver's trial took place October 17-22, 2007; the teleconference hearing with Curry was
Friday, October 19. Curry told the court she was in California and would be back in the Smith
County area sometime on the afternoon of Tuesday, October 23. 
15. 541 U.S. 36, 68 (2004). "Whatever else the term [testimonial] covers, it applies at a
minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and
to police interrogations. These are the modern practices with closest kinship to the abuses at which
the Confrontation Clause was directed."